IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JANET M. COOK, individually and ) | |
| as the representative of the estate of ) | |
| ROBERT BRUCE COOK, deceased, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 02-0808-CG-L |
| ) | |
| ATWOOD OCEANICS, INC., and ) | |
| ATLANTIC MARINE, INC., ) | |
| ) | |
| Defendants. ) | |

## ORDER

This matter is before the court on the motion in limine of defendants, Atwood Oceanics, Inc. and Atlantic Marine, Inc., and plaintiff's response. (Doc. 103)..  Defendants contends that plaintiff should be precluded from offering the expert testimony of Dr. William Shell and, in the alternative, request that this court allow the admission of certified copies of his medical license probation and of the opinions of two cases which previously excluded Dr. Shell's testimony.   The court finds no basis to exclude Dr. Shell's testimony and finds that evidence of Dr. Shell's probation and prior testimonial exclusions is improper impeachment of Dr. Shell's deposition testimony.  Therefore, defendants' motion in limine is due to be DENIED.

## BACKGROUND

On November 2, 2001, Robert Bruce Cook, collapsed from an apparent heart attack while working aboard a vessel at Atlantic Marine Shipyard.    Emergency personnel aboard the vessel and

1

the Atlantic Marine paramedic defibrillated Mr. Cook and regained a pulse on a couple of occasions while still on the rig, but are alleged to have forgotten the necessary cardiac medications at the ground-based Atlantic Marine Clinic.  Mr. Cook was pronounced dead later that day at Mobile Infirmary.  Plaintiff alleges that because defendants failed to timely provide cardiac medications and cardiac advanced life support on the rig, Mr. Cook's heart rate, pulse, and cardiac rhythm were unable to be sustained.

Plaintiff seeks to offer the deposition testimony of Dr. William Shell at trial.  Dr. Shell's testimony includes statements as to a person's statistical likelihood of surviving a heart attack under different circumstances.  Dr. Shell's general conclusion is that Mr. Cook would have had a better chance of surviving his heart attack if he had received certain medications within 20 minutes after his collapse.   The portion of Dr. Shell's testimony to which defendants object concerns his testimony as to whether Mr. Cook died of an acute myocardial infarction or of merely a cardiac arrhythmia.  Defendants state that this issue turns upon the interpretation of a single EKG strip produced at the Mobile Infirmary while Mr. Cook was being treated for his heart attack.  Dr. Shell's testimony includes the following opinions based on his reading of the EKG strip:

> the existing electrocardiograms do not tell you that he had a transmural infarction.  He could have had a very small heart attack.
>
> Dr. Elizardi's judgement that he had a big heart attack is simply not supportable by the evidence.
>
> [The coroner] can't conclude that [it was a massive heart attack].  He has no evidence to conclude that.

(Shell depo. pp. 40, 80, 91-92).  Dr. Shell explained that the EKG was indeterminate because of all the

things that had gone on for the hour before it was taken. Namely, the resuscitation efforts - lack of pulse, epinephrine dispensed to Mr. Cook, whole acidosis, and bicarbonate dispensed to Mr. Cook. (Shell depo. p. 94). According to Dr. Shell, the EKG is very abnormal and is consistent with a myocardial infarction. However, Dr. Shell maintains that the size of the heart attack cannot be determined from the EKG. Dr. Shell essentially states that given the emergency treatment Mr. Cook received prior to the EKG, the EKG is also consistent with a minor heart attack.

## DISCUSSION

Federal Rule of Evidence 702 provides for the admission of expert testimony when "scientific, technical, or other specialized knowledge will assist the trier of fact." The United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579 (1993) found that scientific expert testimony is admissible only if the proffered testimony is both relevant and reliable. "[A] district court judge is to act as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability." Dhillon v. Crown Controls Corporation, 269 F.3d 865, 869 (7th Cir. 2001); see also U.S. v. Majors, 196 F.3d 1206, 1215 (11th Cir. 1999). Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Accordingly, under rule 702, "this Court has an obligation to screen expert testimony to ensure it stems from a reliable methodology, sufficient factual basis, and reliable application of the methodology to the

facts" Whatley v. Merit Distribution Services, 166 F.Supp.2d 1350, 1353 (S.D. Ala. 2001) (citations omitted).

> The Rule, in respect to all such matters, "establishes a standard of evidentiary reliability." [Daubert,] 509 U.S. [579] at 590, 113 S.Ct. 2786. It "requires a valid ... connection to the pertinent inquiry as a precondition to admissibility." Id., at 592, 113 S.Ct. 2786. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, [ ] the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." 509 U.S., at 592, 113 S.Ct. 2786.

Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149, 119 S.Ct. 1167, 1175 (1999).

To aid in determining reliability under Rule 702 this court looks to the non-exclusive factors set forth in Daubert:  (1) whether the theory can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether the theory has a high known or potential rate of error and there exists standards controlling the technique's operation; and (4) whether the theory has attained general acceptance within the relevant scientific community. Daubert, 509 U.S. at 593-94.  The Rule 702 inquiry as "a flexible one." Id. at 594, 113 S.Ct. 2786.  The above four factors are not exhaustive. The primary focus should be "solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595, 113 S.Ct. 2786.  "[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct," but must establish "by a preponderance of the evidence, it is reliable." Allison v. McGhan Medical Corp., 184 F.3d 1300, 1312 (11th Cir. 1999) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3rd Cir.1994)); see also Whatley, 166 F.Supp.2d at1354 ("the proponent of the expert testimony has the burden to establish by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied.")(citations

omitted).

Defendants first attack the credibility of Dr. Shell's testimony by asserting that he provided false or misleading testimony concerning whether his license had previously been revoked. Defendants point to Dr. Shell's response when asked whether his license had ever been revoked or suspended. Dr. Shell answered that "It was on probation in California." (Shell depo. p. 7). Defendants also point to Dr. Shell's testimony that he had not been investigated, or had his license suspended or revoked for anything at any other time. (Shell depo. p. 9). Defendants contend that this testimony is misleading because Dr. Shell's staff privileges at Cedars-Sinai Medical Center in Los Angeles, California, were terminated for a medical disciplinary cause on October 27, 1995, and his license was revoked by the Medical Board of California in 1996. However, defendants admit that Dr. Shell's revocation was stayed by the Medical Board and he was placed on probation. In addition, a more complete recitation of Dr. Shell's testimony reveals that his testimony was not false.

> **Q** Has your license ever been revoked or suspended for any reason?
> **A** It was on probation in California.
>
> **Q** Is it still on probation?
> **A** No.
>
> Q And when was it on probation?
> A Until about three years ago. And I don't remember when it started.
>
> **Q** 1992. Or excuse me 2002, three years ago would be 2002?
> **A** That's when it became current. The probation was lifted. And it started about '96, '97, something in that – in that range.
>
> **Q** What was the reason it was suspended?
> **A** I saw a single patient as part of a clinical trial who had been referred to me on Dilaudid and I continued the Dilaudid, and the board asserted that the dose of Dilaudid was excessive. I had never prescribed Dilaudid before nor since. It was part of a

general discovery of this patient who was selling Dilaudid on the street, and I had no knowledge of it.

**Q** I see. Dilaudid – is that a narcotic pain medication?
**A** Yes.

**Q** And as a result of this incident your license was suspended for, between something like 1996 and 2002?
**A** It wasn't suspended. That's the term they used. It was on probation. None of my privileges were ever suspended. I was able to fully practice in California. The term they used was suspended and then stayed during the probation. So my privileges in California were never restricted.

**Q** Okay. But this probation or suspension, whatever we want to call it, existed for a period of time somewhere between 1996 or 1997, I think you said, until 2002?
A That's correct.

**Q** So something like five or six years?
**A** That's correct.

**Q** Has your license ever been suspended, revoked or have you ever been put on probation at any other time?
**A** No. Nor investigated for anything. Nor as far I know ever any complaint against my license.

**Q** During this, shall we say, five- or six-year period, did you continue to practice medicine?
**A** Yes.

(Shell depo. pp. 7-9). Although action was taken to revoke Dr. Shell's license, the end result was that he was put on probation as Dr. Shell testified. Dr. Shell did not offer that his staff privileges at Cedars-Sinai Medical Center in Los Angeles, California, were terminated for a medical disciplinary cause on October 27, 1995. However, Dr. Shell was only asked about his medical license and was not specifically asked about staff privileges or employment suspensions or terminations.

Defendants next object to Dr. Shell's testimony because his testimony regarding reading and

6

interpreting EKGs has been judicially excluded or withdrawn in prior cases and is being challenged again in a pending case. In his deposition, Dr. Shell denied any knowledge of a court ever ruling that his testimony could not be used in court in any case in which he was retained. Dr. Shell's testimony was excluded in at least two prior cases, In re Propulsid Products Liability Litigation, 261 F.Supp.2d 603, 605 (E.D.La. 2003), and In re Chemical Release of Bogalusa, 73-341 (22nd J.D.C. Washington Parish Feb. 21, 2002). Defendants assert that in the first case, the Eastern District of Louisiana excluded the opinions of Dr. Shell and held that his testimony and opinions regarding the interpretation of EKGs in that case were unreliable and that the very basis of his study was flawed. However, the study in question concerned a link between cisapride (the generic name for the drug Propulsid) and the plaintiff's prolonged QTc[1] intervals. The basis of Dr. Shell's study was found to be flawed because: he used nine subjects that were hand picked by attorneys involved in the litigation, several of the subjects had questionable medical histories making it difficult to determine the case of any QTc prolongation,

---

[1] The Propulsid court explained the meaning and significance of QTC intervals as follows:
Each wave on the EKG is designated by a letter: P, Q, R, S, and T. The Q-wave is the beginning of the electrical discharge of the ventricles. The T-wave represents repolarization of the heart. The time lapse between the Q-wave and the T-wave is the QT interval. This interval represents the time it takes for the ventricles to discharge (or contract) and recharge (or recover).
Because the QT interval varies with the individual's heart rate, it must be corrected using one of several formulas available before a meaningful analysis may be made. The formula corrected measurement is referred to as QTc.
In perfectly healthy people, their QTc intervals vary throughout the day by as much as 50 to 75 milliseconds. Individuals with a prolonged QTc interval are at risk for developing a condition known as "torsade de pointes" (twisting of the points) which is a form of ventricular tachycardia (abnormally fast heart rate) and is characterized by a long QTc interval and a short-long-short sequence in the beat preceding its outset

In re Propulsid Products, 261 F.Supp.2d at 608 (footnote omitted).

and the study merely concluded that the mechanism causing prolonged QTc intervals is "unknown at this time." In re Propulsid Products, 261 F.Supp.2d at 616.  Shell's actual reading of EKG's was not questioned. Instead, Shell's opinions were questioned concerning their relevance and reliability.  Dr. Shell admitted that he could not determine how cisapride affects the autonomic nervous system.  Dr. Shell could only theorize as to what effect the drug might have on an individual's QTc interval.  Thus, his theories were not relevant or reliable.

As to the exclusion of Dr. Shell's testimony in the Bogalusa case, the order excluding his testimony contains very few details as to why it was excluded.   It merely states that "[a]s this court has previously excluded the Haley study," the study shall be excluded.  The court then excludes Dr. Shell's testimony regarding the heart rate variability or QT intervals because Dr. Shell's studies had been rejected in In re Propulsid and because they "fail to pass muster under a Daubert Analysis."  In re Chemical Release of Bogalusa, 73-341, p. 1 (22nd J.D.C. Washington Parish Feb. 21, 2002).   As discussed above, concerning the Propulsid case, there is no evidence that Dr. Shell's testimony was excluded because Dr. Shell's reading of EKG's was inaccurate.  It appears that his studies did not "pass muster" because the methods used to select subjects were questionable and because the studies were inconclusive.

In the instant case, the EKG in question is from the decedent.  Plaintiff has not offered any studies conducted by Dr. Shell and Dr. Shell's testimony does not concern QTc intervals or the effect of drugs on QTc intervals.  The court finds no reason to exclude Dr. Shell's testimony here based on the exclusion of his testimony in the previous cases.

As to whether Dr. Shell's testimony concerning his being unaware of any court ruling that his

8

testimony had been excluded, there is no evidence that Dr. Shell knew of the rulings. While it would seem likely that Dr. Shell would be aware of the rulings since he was aware that his testimony had been objected to, the court will not exclude Dr. Shell's testimony based solely on that unsupported presumption. The court notes that Dr. Shell mentioned the Bogalua cases in his testimony in this case and stated that he did not testify at trial and understood that they had been settled. (Shell depo. p.14 - 22). The Propulsid case also did not go to trial, but was dismissed on summary judgment upon the exclusion of the testimony of Dr. Shell and another expert. In re Propulsid Products, 261 F.Supp.2d at 619.

Lastly, defendants object to Dr. Shell's testimony because "Dr. Shell's methodology in the interpretation of the EKG in this case cannot be presumed." Defendants assert the following:

> Neither this Court nor the jury should presume that Dr. Shell's opinion in this case was derived from any methodology accepted in his field merely because by education he is a cardiologist. At the time of his deposition in this case, the foregoing facts concerning exclusion of his testimony were unknown by the defendant, and Dr. Shell's responses to questions about them were clearly misleading and arguably untruthful. Since his interpretation of an EKG in this case is also the very same subject about which his methodology has been questioned and rejected or withdrawn in the past, this Court must require proof of his methodology in arriving at his opinion in this case. The deposition testimony offered by plaintiff does not contain such evidence and this deficiency is fatal to admission of this testimony in this case. The deposition testimony must be excluded.

(Doc. 104 - Defendants' Brief p. 10). However, as discussed above, defendants have not shown Dr. Shell's testimony to be misleading or untruthful. In addition, the court found above that the basis for which Dr. Shell's testimony was excluded in previous cases is not present in this case. The court also notes that evidence cannot be excluded "on the ground that the court believes one version of the facts and not the other." Allstate Insurance Co. v. Hugh Cole Builder Inc., 137 F.Supp.2d 1283, 1285

(M.D. Ala. 2001) (quoting Rudd v. General Motors Corp., 127 F.Supp.2d 1330, 1334 (M.D.Ala.2001)).  As the Allstate court stated:

> [T]he rejection of expert testimony is the exception rather than the rule.  Daubert did not work a seachange over federal evidence law, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.  Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

Id. at 1286-87 (quoting Rudd, 127 F.Supp.2d at 1334).  Defendants do not contend that Shell lacks sufficient experience or knowledge to properly read Mr. Cook's EKG and defendants are free to offer evidence to counter Dr. Shell's conclusion.  As previously stated, plaintiff does not have to prove that Dr. Shell is "scientifically correct" that Mr. Cook's EKG is inconclusive as to the magnitude of Cook's heart attack.  Allison, 184 F.3d at 1312 (citation omitted).   The court finds no basis to exclude Dr. Shell's testimony.

Defendants request, in the alternative that, if the court allows Dr. Shell's testimony, the court also allow certified copies of his medical licensure revocation and probation and of the opinions in the cases mentioned above which excluded Dr. Shell's testimony.[2]  Such evidence may be proper to cross-examine Dr. Shell if he testifies at trial, but the court finds it inappropriate, under F.R.Evid. 608, to impeach Dr. Shell with extrinsic evidence of specific instances of conduct.

---

[2] The court notes that defendants report that Dr. Shell was scheduled to be re-deposed for the purpose of perpetuating his testimony for trial, but that plaintiff cancelled the deposition and informed counsel for defendants that the discovery deposition of Dr. Shell will be used.  Defendants state that they have no objection per se to the use of Dr. Shell's discovery deposition, and object only to the admissibility of the evidence contained in the deposition.  (Doc. 104, p. 4 n 5).

## **CONCLUSION**

For the reasons stated above, defendants' motion <u>in limine</u> (Doc. 103) is **DENIED**.

**DONE and ORDERED** this 6th day of June, 2005.

                                              /s/   Callie V. S. Granade
                                          CHIEF UNITED STATES DISTRICT JUDGE